**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  05 C 5373 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| SANDOZ, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Sandoz, Inc. ("Sandoz") brings before this Court a Motion to Stay Preliminary Injunction Pending Appeal pursuant to Federal Rule of Civil Procedure 62(c).  Sandoz asks this Court to stay enforcement of a preliminary injunction and vacate the order it issued on April 16, 2007. Abbott Laboratories ("Abbott") sought to enjoin Sandoz from marketing a generic extended release form of the antibiotic drug, clarithromycin, that allegedly infringes Abbott's U.S. Patent Nos. 6,010,718 (the "'718 patent"), 6,551,616 (the "'616 patent") and 6,872,407 (the "'407 patent") relating to its Biaxin ® XL product.  After an evidentiary hearing and reviewing the evidentiary submissions by the parties, this Court concluded that Abbott had clearly demonstrated a likelihood of success on the merits of its infringement and validity claims, that it would suffer irreparable injury if Sandoz's market intrusion were not enjoined, that the balance of the hardships favored Abbott and that the public interest would best be served by issuing the injunction.   Therefore, this Court issued a preliminary injunction order.  Sandoz now seeks to stay enforcement of the Court's order pending an appeal to the Federal Circuit.  For the reasons stated below, Sandoz's motion is **DENIED**.

-1-

## I. BACKGROUND

The facts underlying this action have been discussed at length in this Court's previous preliminary injunction opinion and do not need to be repeated here. See Abbott Labs. v. Sandoz, Inc., 2007 WL 1141635 (N.D. Ill. Apr. 16, 2007).

## II. STANDARD OF REVIEW

Whether to issue a stay of enforcement of a preliminary injunction pending appeal is within the sound discretion of the Court. Fed. R. Civ. P. 62(c). In determining whether a stay of enforcement is warranted, a district court will examine whether the party seeking a stay has demonstrated (1) a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured should the stay be denied; (3) whether the stay would substantially injure the other parties; and (4) where the public interest lies. Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Hinrichs v. Bosma, 440 F.3d 393, 396 (7th Cir. 2006).

## III. ANALYSIS

### A. Strong Showing of Success on the Merits of Appeal

A party seeking a stay of enforcement pending appeal must demonstrate a strong showing of success on the merits. Hilton, 481 U.S. at 776. That requires something less than a fifty percent chance of success. Thomas v. City of Evanston, 636 F.Supp. 587, 590 (N.D.Ill. 1986). Also, the strong showing relates to the success of the appeal, not the ultimate outcome of the litigation. See Glick v. Koenig, 766 F.2d 265, 269 (7th Cir. 1985). This distinction is important because this Court will only now consider those matters that properly will be before the Federal Circuit on appeal of the preliminary injunction order in determining whether Sandoz has made a strong showing of success on the merits of an appeal.

1. <u>Whether the Previous Conflicting Federal Circuit Opinions Establish a Substantial Legal Question</u>

Sandoz cites <u>E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.</u> for the proposition that the very existence of a conflict between the United States Patent and Trademark Office Examiner's rejection of a patentee's claims as invalid in view of prior art and the district court's subsequent ruling of validity supports the alleged infringer's argument that substantial legal questions concerning claim interpretation existed. 835 F.2d 277, 279 (Fed. Cir. 1987). That is an accurate citation, however, the holding is inapposite to the facts presented in this case. Here, the conflicting opinions are between two panels of the Federal Circuit, not the patent examiner and the district court as in <u>DuPont</u>. <u>Id</u>.

The Federal Circuit was presumably aware of its first opinion in 2006 when it drafted the second opinion in 2007. Contrary to Sandoz' contention, the fact that the Federal Circuit rejected this Court's initial claim construction upon a *second* look is a fact that militates against a showing of success on appeal on this issue. In the 2006 opinion, the Federal Circuit did not hold that this Court erred in relying on Markush language in the '718 patent specification. But in the 2007 opinion, it reached a different conclusion. The only rational assumption is that the Federal Circuit either relied on something different in the record for the 2007 opinion or recognized something that it had previously missed, which would lead one to predict that the Federal Circuit would not retreat from its 2007 holding in favor of its 2006 holding on the instant appeal.

Likewise, Sandoz's assertion that the broadened claim construction makes the claims more susceptible to an invalidity challenge is unavailing. Stating that the broadened claims are

more susceptible to challenge in the abstract does not in itself make the claims invalid or establish a substantial question of invalidity. A challenger must still utilize the available evidence to persuade the Court that there was a substantial question of validity. Sandoz did not and has not persuaded this Court that a substantial question of invalidity existed.

This Court found that Sandoz's obviousness argument based on the combination of the WO '422 publication and the '190 patent did not amount to a substantial question because there was no indication that either prior art disclosed the pharmacokinetic ("PK") limitations of claim 1 and 4; and there was no indication that either prior art would motivate a person of ordinary skill in the art to combine their teachings to arrive at the '718 patented invention. So rather than relying on the TSM test, this Court based its analysis on the finding that Sandoz did not show that every limitation of the claimed invention was present in the prior art. Sandoz has not submitted any evidence to change those findings.

2. Whether under the Supreme Court's KSR Holding, Sandoz has made a Strong Showing of Invalidity for Obviousness on Claims 1 and 4 of the '718 Patent

The Supreme Court recently clarified the standard for determining when a patent that claims a combination of elements of prior art is obvious and invalid under Section 103. KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727 (Apr. 30, 2007). In defending against Abbott's Motion for a Preliminary Injunction, Sandoz argued that claims 1 and 4 of the '718 patent were obvious over prior art. Understandably, Sandoz now argues that the KSR holding may render the preliminary injunction order reversible, and at a minimum, establishes that Sandoz is entitled to a stay of enforcement of the preliminary injunction order. Sandoz is incorrect.

In KSR, the Supreme Court dealt with the question of whether the Federal Circuit erred in its application of the "teaching, suggestion or motivation" test (the "TSM test") for

obviousness in light of the Supreme Court's precedent. 127 S. Ct. at 1734-35. According to the TSM test as articulated by the Federal Circuit, a patent claim would be obvious only when some motivation or suggestion to combine the teachings of the prior art is found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art. Id. (citation omitted). The Court held that the Federal Circuit's application of the test was too narrow and did not adhere to the purpose behind Section 103, which is to disallow a potential patentee from reducing what is already known into the field of its monopoly and diminishing the resources available to those skilled in the art, thus unfairly stifling innovation. Id. at 1739 (citing Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152 (1950)).

The Supreme Court reaffirmed in KSR that " a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." Id. at 1741. When determining whether a claim is obvious, it is error to only regard the problem that the patentee was attempting to solve in developing the invention because such a limited inquiry only takes into account what the patentee may have thought was obvious, not what a person of ordinary skill in the art would consider to be obvious. Id. at 1742. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. Next the Court explained that it is error for a court to assume that one of ordinary skill in the art attempting to solve a certain problem would be led only to those elements of prior art that are designed to solve the same problem. 127 S. Ct. at 1742. KSR makes clear that in this case, a proper question to ask in determining whether to issue a preliminary injunction is whether an ordinary person skilled in the art would have seen a benefit

to combining an erythromycin derivative with a polymer with the same PK limitations as embodied in claims 1 and 4 of the '718 patent given the state of the pharmaceutical industry at the time. Based upon what evidence and argument Sandoz offered this Court, the answer was and remains no.

There was no indication that either prior art disclosed the specific PK limitations of claim 1 and 4, and thus, there was no indication that the prior art would motivate a person of ordinary skill in the art to combine their teachings to arrive at the '718 patented invention. After reading the Supreme Court's KSR opinion, this Court is left with the understanding that the need to demonstrate the presence of all claim limitations in the prior art (when the legal theory is based upon obviousness due to the combination of prior art teachings) has not been obviated.

Prior to the issuance of the KSR opinion, Federal Circuit precedent taught that all the claim limitations of the invention at issue must be found to exist in the prior art references before it could be determined whether there was a teaching, motivation, or suggestion to combine those limitations. See e.g. Velander v. Garner, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining what a proper analysis under Section 103 requires after "all the elements of an invention are found in a combination of prior art references"); U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1564 (Fed. Cir. 1997) (affirming a district court's instructions to a jury that "the prior art must show not only all of the elements of the claimed combination, but must contain some 'teaching, suggestion or incentive' to a person of ordinary skill to combine the known elements in the way that" the inventor combined them"). The KSR opinion only focused on the Federal Circuit's strict use of the TSM test in performing the obviousness analysis; it did not mention or affect the requirement that each and every claim limitation be found present in the combination of the prior

art references before the analysis proceeds. In the KSR opinion, the Court mentioned two Federal Circuit opinions in which the Courts utilized broader, more flexible versions of the TSM test. 127 S. Ct. at 1743. In one of those opinions, the Federal Circuit again instructed that before inquiry into the teaching or motivation of the prior art, all claim limitations must be found in the prior art references. DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co., 464 F.3d 1356, 1360 (Fed. Cir. 2006).

As explained in the preliminary injunction opinion, Sandoz did not persuade this Court that the WO '422 publication, the '190 patent and the FDA regulations would have led to a person of ordinary skill in the art duplicating the specific PK limitations of claims 1 and 4 precisely because this Court preliminarily found that 1) the PK limitations were absent from the prior art and those specific PK limitations were not inherent to the structural limitations of the claims at issue.

The '190 patent disclosed the use of an alginate polymer in making sustained release formulations and discloses the use of clarithromycin. The WO '422 publication disclosed sustained release dosage forms of azithromycin in general and disclosed a sustained release formulation created from combining azithromycin with HPMC in particular. Sandoz argued that claims 1 and 4 of the '718 patent would have been obvious in light of the combination of these two prior art references along with the FDA definition of the term "bioequivalence". Basically, the argument was that the teachings of the prior art references would have motivated a person of ordinary skill in the art to combine the structural limitations present in the WO '422 publication and the '190 patent in an effort to provide an extended-release clarithromycin product (solving a known problem ). Once the effort began, the person of ordinary skill would have tried to achieve

the FDA definition of bioequivalence (defined as having a substantially equivalent area under the curve, which means the aggregate amount of systemic circulation over a given time period). The pursuit of bioequivalence would then have led such a person to obtain a lower maximum plasma concentration while simultaneously maintaining a minimum plasma concentration substantially equivalent to an immediate-release formulation.

But this Court's preliminary factual findings did not support Sandoz's argument. This Court found that Sandoz had not produced evidence indicating that the PK limitations were disclosed in the prior art or were inherent to the structural limitations of the prior art compositions. For example, the '190 patent referred to $C_{24}$, a plasma concentration measurement taken 24 hours after dosing, while the '718 patent refers to Cmin as the minimum plasma concentration during the 24 hours after dosing. Thus, the two plasma concentration measurements were not the same. Most importantly, this Court also found that a person skilled in the art would not treat those different C values as being interchangeable. Further, the Court found that it was not possible for a person skilled in the art to utilize DFL from the '190 patent formulations to create the '718 invention because of differences in which the underlying variables used to calculate DFL (Cmax, Cmin, and AUC) were themselves calculated. Another crucial finding was that a person skilled in the art would not be motivated to look at the WO '422 publication and interchange clarithromycin for azithromycin because the '190 patent did not disclose the PK profile of the '718 patent.

Sandoz repeats its previous argument because in its view, the KSR opinion instructs courts to more readily find a claim is obvious when the claim presents nothing more than a combination of what was previously known. That may be true, but the KSR opinion does not

instruct a court to find facts that are not established by the evidence even when those facts would better support an obviousness challenge.

3. <u>Whether a Substantial Question exists under the KSR holding as to the Validity of Claim 6 of the '718 Patent and Claim 2 of the '616 Patent</u>

As discussed earlier, the strong showing of success on the merits, required to show that a stay is warranted, relates to the success of the appeal. See <u>Glick</u>, 766 F.2d at 269. Therefore, the only claims that need be considered in this motion to stay enforcement *pending appeal* are those claims that are appealable. Although it is not a "new" theory, as Teva brought this claim in separate proceedings, Sandoz expressly abandoned pursuit of this claim in the preliminary injunction proceedings, so it is will most probably be foreclosed from arguing it on appeal to the Federal Circuit. See <u>Sage Products, Inc. v. Devon Indust., Inc.</u>, 126 F.3d 1420, 1426 (Fed. Cir. 1997). Therefore, Sandoz cannot show a strong likelihood of success on the merits of this claim.

**B. Irreparable Injury**

The second issue to consider when determining if a stay of enforcement is warranted is whether the applicant will be irreparably injured should the stay be denied. <u>Hilton</u>, 481 U.S. at 776. Sandoz contends that if it is forced to leave the market now while other potential generic competitors remain, those competitors will capture Sandoz's market share and leave Sandoz unable to re-enter the market later. Re-entry will be forclosed because pharmacies will be relunctant to re-stock their shelves with Sandoz's product once consumers begin to identify and consume other generic products. There has been ample evidence presented to this Court of the effects of the presence of generic pharmaceutical products on the market share of producers of branded pharmaceutical products, but not much on the effect of generic on generic competition.

The whole economic lure of generic products is their lower prices relative to branded products, not their recognition amongst consumers, so it is difficult to see why Sandoz would have any trouble re-entering the generic product marketplace regardless of the presence of other generic drugmakers. Sandoz has not offered any evidence as to why adequate competitive pricing could not help it re-capture any "unfairly" lost market share. In short, Sandoz has not shown irreparable injury.

**C. Injury to Other Parties**

Sandoz states that Abbott would face little harm if Sandoz were allowed to stay enforcement of the preliminary injunction pending appeal. In support of this contention, Sandoz argues that this Court 1) incorrectly placed the burden of showing no irreparable harm on Sandoz in the first place and 2) attributed an improper amount of weight to Abbott's evidence of irreparable injury. So in explaining how issuing a stay would not substantially injure Abbott, the other party in this matter, Sandoz chooses to attack this Court's previous finding that Abbott was entitled to a presumption of irreparable harm and this Court's reliance on Abbott's purported harm in the preliminary injunction proceedings. Such discussion is more appropriate for explaining why the litigant has established a strong showing of success on appeal because this specific requirement of demonstrating no injury to other parties does not ask for the litigant to attack the basis for the underlying order, rather it calls for the seeker of the stay to discuss the injury to the other party if the stay is withheld. Nevertheless, the Court will consider Sandoz's argument.

This Court previously found that Abbott made a clear (i.e. strong) preliminary showing of both infringement and validity of the '718 patent. Based upon that finding, Abbott was afforded

a presumption of irreparable harm. See Amazon.com v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001). However, this Court did not simply rely on that presumption in granting the preliminary injunction; instead it considered Sandoz's arguments as to why Abbott would not be irreparably harmed if no preliminary injunction issued. The Court concluded that Sandoz's reasons did not rebut the presumption afforded Abbott. There is no need to again discuss the basis for awarding that presumption to Abbott, as the obviousness and claim construction issues were already discussed.

Sandoz previously argued that Abbott's licensing agreements show that Abbott would not suffer irreparable injury. This argument deals with the appropriateness of money damages as compensation for market intrusion before resolution of the infringement action. This Court specifically considered the limitations of money damages in restoring Abbott in light of the substantial intangible losses that accompany market share and revenue erosion, which included lost good will and lost sales representatives, and found that Abbott would not be fully satisfied by an award of money should they ultimately prevail at trial. Sandoz argues that this Court ignored Federal Circuit precedent in considering this evidence. It states that in Eli Lilly & Co. v. American Cyanamid Co., the Federal Circuit held "that such ripple effects are part and parcel of a loss of sales." 82 F.3d 1568, 1578 (1996). That Court specifically held that a patentee's claim of loss in the ability to conduct research stemming from a loss of sales was insufficient by itself to support a preliminary injunction. Id. at 1578. Furthermore, in that case, the presumption of irreparable injury was not applied by the lower court. Id. Here, after establishing that they were entitled to the presumption of irreparable injury, Abbott went on to explain how the intangible losses due to Sandoz's intrusion contributed to the necessity of the preliminary injunction.

Sandoz also argues that this Court improperly discounted evidence of Abbott's licensing agreements as indicative of its abandonment of the right to exclude. While the Court accepts Sandoz's contention that entering into licensing agreements can bear on the irreparability of the harm resulting from loss of market share, the Court does not accept that licensing agreements magically obviate a patentee's right to exclude others. Sandoz argued that the presence of another generic competitor and the existence of licensing agreements in the market demonstrated Abbott would not be irreparably harmed by Sandoz's continued presence in the market until the infringement action was resolved. Sandoz resurrects those same arguments here.

This Court already found that the licensing agreements that Abbott entered into did not allow other producers to enter the market until 2008. But Sandoz argues that another competitor is currently on the market. Assuming that the other competitor's presence is unlawful, instead of concluding that two illegal competitors would inflict a greater amount of irreparable injury than one, Sandoz argues that 1) the presence of one illegal entrant shows that the second entrant's presence would not harm Abbott, and 2) removing one illegal participant would do nothing to stop the harm caused by the other participant. Sandoz may be correct that the initial entry of a generic competitor damages the brand name producer in greater proportion to subsequent entries But surely the subsequent unlawful presence of generic competitors nonetheless inflicts harm on the brand name producer because at the very minimum, there is greater supply of competitive product on the market than there otherwise would be. The purpose of the preliminary injunction is to prevent irreparable harm that would be inflicted on Abbott by Sandoz, no one else. So while a preliminary injunction may be ineffective in preventing the irreparable harm of others

not party to this action, that is hardly a reason to allow Sandoz's probably unlawful conduct to go unchecked.

In conclusion, this Court did not incorrectly apply the presumption of irreparable injury because it found that Abbott had clearly shown a likelihood of success on the merits at trial.

**D. Public Interest**

The public interest is not served by the enforcement of allegedly invalid patents or the extension of monopoly pricing by means of invalid patents over the distribution of low cost pharmaceuticals. But given that this Court does not envision Sandoz successfully appealing the preliminary injunction order and that it finds that Sandoz has not offered a strong showing of success on the merits of an appeal, the public interest to be served here is in protecting rights secured by valid patents, not in competition in the pharmaceutical market.

**IV. CONCLUSION**

For the reasons discussed above, Motion to Stay Preliminary Injunction Pending Appeal pursuant to Federal Rule of Civil Procedure 62(c) is denied.

Enter:
/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **May 24, 2007**